Okay, we'll call the next case. Rosemary Charrillo v. Governor of New Jersey. Mr. York? Yes, Your Honor. May it please the Court, my name is Tom York, and I represent the appellants. And with the Court's permission, I would like to reserve three minutes for rebuttal. That request will be granted. Thank you, Your Honor. Your Honor, in order to understand this case, as you may well be aware from reviewing the pleadings, it's very important that you understand, Your Honors, that these are profoundly disabled intellectually individuals, and these are severely disabled individuals often in a physical sense too. They require constant care, 24-hour supervision, sometimes even nursing care, constant help with feeding and so on. These are not individuals who have laid that out all very clearly. Let me ask you a procedural question up front, because it's my understanding North Jersey is already closed, is that right? That is correct, Your Honor. All right, and then Woodbridge, is that scheduled to be closed? It is scheduled to be closed, I think, within the next few months, Your Honor. And how many of your 20 clients that at the time the case was pleaded who were living at Woodbridge remain there presently? I would estimate right now, I don't have an exact count because the movement is ongoing, but probably around 15 right now, presently. Okay. So the case revolves around what happens to those 15 folks that are presently at Woodbridge. That's correct, Your Honor. And you want us to enter an order requiring Woodbridge to stay open? No, Your Honor. We are not seeking an order that Woodbridge specifically be kept open. So you want an order that the folks be transferred to other development centers as opposed to community centers? You've laid out, I think, in some detail your concerns and the family's concerns about the inability of your clients to be appropriately taken care of in community centers. So are you looking for a transfer order to the other development centers? Not necessarily, Your Honor. What we're looking for, and I want to make clear to Your Honor, that we have not argued for the absolute right to reside in an institution, and we have not claimed a right to remain at a particular institution. Instead, what we have claimed is a right to the exercise of professional judgments. That's the least restrictive environment that can meet their needs. This is the challenge I've had because you take strong issue with the district court and with the state. In fact, you use language like the district court repeatedly mischaracterized or that the state repeatedly mischaracterized your position. But I'm looking at your complaint, and you say in paragraph 141 of it, the plaintiffs are entitled to injunctive and declaratory relief that the defendants shall not discharge or transfer them from their current residence without meeting the requirements of that. And then you have a list of the requirements, which are linked by and. In other words, all of these have to be met, and one of them is the plaintiffs, by their guardians or families, wish to consent to such discharge or transfer. So if it's not your position now, can you at least acknowledge that it was your position then because it appears to be pled in black and white in your complaint that it is a condition? Your Honor, and I apologize if the complaint was not maybe as artfully pled as what it should have been, but that has never been our position from day one that we said that they had an absolute right to a particular institution. What we have always argued, and I think if you look at the rest of the complaint, which I'm sure you have, what we've argued is instead they have certain rights before they can be transferred, and those rights are that they have to have professionals, the interdisciplinary team, exercise their professional judgment and determine what is the least restrictive environment that can meet their needs, and that also you have to weigh the consent of the individuals. We've never also ever pled or argued that the consent is an absolute veto power over never being moved. So couldn't the state just move your clients to other development centers then? And if they're unhappy with those, their families and guardians, et cetera, are unhappy with those development centers, then they could take action to have them relocated to community centers or other appropriate places according to what the guardians and family members think is right. Well, Your Honor, you are correct. Our position is that they could move them to other developmental centers if they comply with their rights. And what happened to the patients or the residents in North Jersey? Where did they go? The residents in North Jersey, some went to the community, because the ones that I know that went to the community, especially there was a couple of them that even have dropped out, and I think you might see in the record, they removed their names. They dropped out of the case because I think they felt coerced that they wouldn't have services if it didn't move. And then some have been moved, I believe principally to Vineland, to the southern part of the state. Did the state allow those that wanted to stay in an institution to stay in an institution? That's what we're uncertain of, Your Honor, to this very day, whether they're going to allow that to happen. No, it's not uncertain. It happened. Did the state allow the folks from North Jersey who wanted to stay in development centers to stay in development centers? I believe, Your Honor, that all those people, that some of them, yes, were allowed to stay in state developmental centers, but not all of them. And some were forced out of development centers? Yes, I believe. They were told you're not allowed to go to a development center? I believe they were coerced into accepting another placement, and also because they were intimidated by the fact and discouraged by the fact that their loved ones would be moved so far away from them. That's really the issue here, the distance, right? That's one of the issues, Your Honor, correct. What if the state agreed that anybody who wanted to stay in a residential center could stay in a residential center? Would you be satisfied? Not by that alone, but that would help allay some of our concerns, Your Honor. But again, we would want the interdisciplinary team. Why wouldn't that allay your concern? If you acknowledge and you've repeatedly in your briefing and here again walked away from what you pled, because the pleading is clear, you did say that in order to be moved there had to be consent, but assuming you can walk away from that like you have, why wouldn't you be satisfied if the offer were made plainly to you that those 20 residents or the 15 who remain in Woodbridge, if they want to be in a developmental center, they can be in a developmental center? Because, Your Honor, not all institutions are equal. Not all institutions are run the same way. You would still need professional judgment as to whether or not that alternative institution can meet the needs of those individuals. I thought your answer was going to be that's unsatisfactory because if I'm a guardian for a child or a relative and Woodbridge is 15 minutes from my house, this is going to be a tremendous burden on me to drive two and a half hours to take care of them and visit them. That is correct, Your Honor, but that's part of what should be considered by the interdisciplinary team. That's one of the evaluations or one of the inputs that should go into that decision-making process as to whether or not it is an appropriate setting for them to be moved to and whether their needs can be met there. So, logically, in the end, aren't you saying, in fact, you can't close Woodbridge because there's not another institutional setting that will meet my client's needs? No, we are not saying that, Your Honor. Well, I'm trying to understand what's the logical end of your argument. If the logical end of your argument is not they shouldn't be forced out of a development center and there are other development centers they could go to, then isn't the only conclusion left they have to be left in this development center? This is where they have to be. No, I don't believe we reached that conclusion or that's what we promote or argue at all, Your Honor. Our position is, again, probably at best what we can do is possibly delay the closure. If the state is intent on closing the facility, we can possibly delay it some because they have to follow the rights of these individuals. But they've got to go through the proper processes we believe has been recognized by Olmstead. What's the statutory? Let's get to the statutory basis that you believe gives your clients that right. It would be essentially, Your Honor, the provisions under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act and then those interpretive regulations that have been promulgated pursuant to that saying that you must put people in the least restrictive environment appropriate to the needs. And the problem is what we have in the case of the state and the U.S. Department of Justice that you're going to hear from too is they sort of stop at the end of least restrictive environment and they always interpret the community as the least restrictive environment. It's appropriate to the needs. That's why Olmstead was very clear that not everybody has to be forced out of institutions. Not everybody has to accept. Your problem with the ADA and the RA is that there's no one in the community who's treated differently. Isn't that the problem? Isn't that the problem you have to get under the statutory provisions of those acts? I would disagree, Your Honor. I believe they are treated differently. We have a group of individuals who are so severely impaired unlike any other group. The ones that have already been moved out are principally much higher functioning, much more capable individuals. Both of those acts talk about discrimination. Right. Where is the discrimination here as is defined by either of those statutes? The discrimination, Your Honor, is in the fact that you have this group of severely disabled individuals who are being moved against their wishes without consideration of their consent and without the proper evaluations that are required not only under Medicaid but also recognized by Olmstead. That might have weight if they're being forced out of the development centers into community, into more liberal community centers. I mean, that seems obvious. But as long as the state's willing to maintain them in development centers, are you saying it's discriminatory to move someone from the Woodbridge Development Center to the whatever? I think there are five others. Is that right? Again, Your Honor, it would depend on whether or not they were properly evaluated and whether or not it was determined that those other centers. But is there something different about, I don't remember anything in your pleading, that these development centers, some of them are inadequate or they don't, I don't remember reading anything that said, the other development centers to which I personally understand your clients to be entitled to be transferred to are somehow unable or unwilling to meet their needs. I understand that doesn't help me as a guardian if I have to drive two hours. Right. Have you pleaded, have I missed that? Have you pleaded something that says these other development centers? I don't believe it was specifically pled in the complaint, but it was mentioned. I do touch upon it, I think, in our reply brief. And we do point out that all institutions are not the same, that some actually have specialty units that care for certain conditions, certain medical problems, certain high level. Some have health care units that are almost like a hospital, while other ones don't. Have you linked that up with any of the particular needs of your clients? I don't see that in the record anywhere. Well, Your Honor, they haven't yet moved some of the clients that have not consented, have not been coerced into consenting. But we believe that they will eventually move them to Vineland. You talk about coercion and you talk about consent, which seems fundamentally inconsistent with your substantive due process argument. Your substantive due process argument, as I understand it, is that these people are being, in effect, held involuntarily in the sense that they have no choice. They are mentally incapable of volunteering to stay here, so they're kept there, in a sense, involuntarily. Did I understand the substantive due process argument correctly? Yes, I believe so, Your Honor. So if your assertion is they're mentally incapable of choice, how is the rhetoric of choice and coercion meaningful or helpful when we talk about these people? That's a good question, Your Honor, and the reason why is, I guess, because I refer to them all as my clients, and maybe I have to make sure it's clear. The clients themselves, the individuals who reside at the developmental centers, are not capable of making those decisions. It's then their guardians who have to make those decisions for them. Those are the people who are being frightened and coerced into making decisions because they're being threatened that there will be no services for them later if they don't accept the ones that maybe are unacceptable to them now. Is there a – and I don't mean this to sound the least bit flippant. I think everybody on this panel, certainly, I'm acutely aware of how difficult the circumstances have to be when you've got a loved one who's caught in the position that these folks are caught in with transitions being required. But is it possible for substantive due process rights to sort of leap out of the people who are being in custody, as you described them, to guardians and others? In other words, can the fact that you have clients who are guardians who feel upset because they're not consenting, does that mean anything in terms of whether the people who are actually in the institutions are there in, quote, custody or unquote? I think that's an excellent question. No one's raised that before, and I haven't really given it a great deal of thought. I mean, my initial gut reaction, which has very little weight, is yes, I believe it could leap to the guardians. And who else would represent their interests? But I have not researched that, Your Honor, and I don't want to go on record as saying that's the status of the law specifically. It's just – and, of course, I'll be asking the other side this too. The language of consent and coercion comes up repeatedly here, and it seems in one way as applied to the residents themselves, distinctly in a positive. All right, Mr. York, we'll have you back on the line. Thank you, Your Honors. And we'll hear from Mr. Bushy. Good morning, Your Honor. Mike Bushy on behalf of 4 Incorporated. We are touching upon sort of a specific issue in conjunction with appellant's brief, focusing mainly on the Supreme Court decision in Olmstead. And our position is, based on the district court's order, it should be reversed for failure to factor in the Olmstead decision and apply the Olmstead factors to the ruling. Well, he did factor it in. You guys don't like the way he factored it in, but the district court judge clearly thought about it, discussed it in some length, and said you're trying to impose the obverse of the ruling, and that's not what is called for. So where's the logical flaw in Judge Chesler's conclusion that a statement that it's discriminatory not to allow people who want to go into communities to go into communities morphs into it's discriminatory to close institutions when the state thinks an institution should be closed? Your Honor, we respectfully disagree that the factors were correctly applied. I do think this case represents an inverse of the Olmstead facts. However, the main factors of that case still apply here. And I think that the main point we have is that the professional treating providers need to assess and give an opinion with respect to each of these individuals, what's best suited for their needs and well-being. Let me ask this. What in the record indicates that that's not being done here? That's a fair point, Your Honor, but my position would be that there's nothing in the record that indicates that that has been done. And our position is we want to ensure that that right is applied and factored in, because that's a key component to every individual's right to choose their care or to have the best care available to them. So is the nub of this dispute then that the guardians need some advice as to whether their loved ones should be moved to a different development center or to be transitioned into the community center? Is that really what? I think that's essentially our position. However, I do think you touched upon it. Because that doesn't seem that difficult. I would think the state could do that. I don't know. Maybe it's asking too much of the state. I agree wholeheartedly. I think the main point is that ideally these facilities would stay open, but since that is not going to be the case, these individuals should have the utmost diligence with respect to a professional and their families be educated to the utmost ability so they are making the appropriate choices and figuring out what the least restrictive environment is for their needs. And the least restrictive, I would argue, is presented by the government as always a community center setting, which in a lot of these individuals' cases, least restrictive. Well, it is. Community centers are less restrictive. They might not be appropriate to the folks' needs, but they are less restrictive than the development centers. That seems obvious. And that's a fair point, taking least restrictive at its face definition. I think Olmstead looks at it more as least restrictive, meaning intrusive on their livelihood. Their well-being. Freedom of movement. Freedom of movement. I would disagree. I believe Olmstead looks at it more like what is least restrictive, in a sense, means what is best for their well-being, their day-to-day. I don't know how you say that, because there are certain folks that are of such unsound mind that the most appropriate place for them is to be severely restricted so they don't hurt themselves. But we wouldn't call that a least restrictive environment. I agree. We would call that a highly restrictive environment that's necessary or appropriate for their needs. And I agree. So I've never quite understood your side's efforts to equate least restrictive with best for my clients, because those seem like two very different things to me. Your Honor, I think we interpreted Olmstead as when they were citing least restrictive as what would be assessed by the professionals and then also weighed in by the family as the best situation. I guess an example would be, you said earlier, ideally a family wouldn't want their loved one too far away. To me, that factor is in the least restrictive. I agree with that. You know, Mr. Bushy, I know you and your organization are very well motivated, but it almost seems to me that it takes me back to my days of legislative hearings. You were here before in court, but the issue that you're trying to iron out is really a question that may be beyond the scope of the courts to resolve based on the laws that are in existence. I mean, I don't see where your request fits into the ADA. I don't see where it fits into the RA. And the district court felt the same way. I mean, how is this a justiciable controversy? Your Honor, my response to that would be based on the Olmstead case. And some of the language in Olmstead reflects potential discrimination under the ADA. For example, and again, I think our position mainly is to ensure that these folks are getting the best care provision and their families' voices are being heard. How is that a discrimination point, though? That's the point the district court was getting at. I don't want me to speak for my colleague, but I take from his question, that's a question he's asking, and it's a question I tried to start with. How is it an issue of discrimination? And maybe there's a California case where they say maybe it's bad medicine, maybe it's bad policy, maybe it's misguided, but it's not under the ADA or under the Rehabilitation Act or under Olmstead's interpretation of them a matter of discrimination. That's what that Central District of California judge said for a state to say, you know, we're making the community stuff the treatment option here because we're closing an institution. So explain how that is an issue of discrimination under the statutes. Yes, Your Honor. My response to that would be, as your scenario, if the state were to say that all of these individuals must go to a community setting, as my colleague expounded on, many of these people are profoundly disabled, community setting would drastically affect their health, their well-being. I think in a sense those individuals are, they're being violated under the ADA with their care. They should be in a different, more restrictive environment. And from them not being allowed that opportunity. So do you not see a difference between poor policy, bad medicine, and discrimination? In other words, the ADA by its terms, by one of its section's terms, was aimed at not segregating people, which seems a distinct evil, if you want to call it that, from bad judgment about what's best medically for somebody. Two different problems. Both problems, but different problems, right? Absolutely. I wholeheartedly agree with that. And I do think the ADA is a tough vehicle from where we're coming from. Okay, all right. Well, thank you. Thank you. Thank you for your participation. Thank you. Mr. Hughes. And Mr. Hughes, as you get started here, a couple questions have been asked. We learned here today that North Jersey has been closed and Woodbridge may soon be closed. And the other question I have is, is the state willing to say that anyone who wants to stay in a center, that they'll transfer them to another center? Thank you, Your Honor. Gerard Hughes, Deputy Attorney General for the Appellees. The answer to that question is yes. They've already done that. All right, but how can they be guaranteed of that? Is it in writing? I'm putting myself in the shoes of one of these guardians. If someone says to me, don't worry, your loved one will be moved to another development center, and then December 20th rolls around and they say, oh, well, there aren't any beds, so why don't you go to this community center down the road? Then I have a real problem on my hands, right? I don't think you would under the ADA, but before we get to that point, the reason they are guaranteed that is because that's what's happened to date. We started with a practical question. I understand it's outside the pleadings, but my understanding is that there are approximately six individuals, six plaintiffs, that are still left at Woodbridge. Not 15. Not 15. And the ones that have transferred, by and large, have gone to other developmental centers. So that is what has happened already. The ones who have gone to the community have consent to the community placement. So there's a judgment made by the treatment team as to whether a person can be served in the community, and then there's the wishes of the person or the guardian as to whether they want to go there. So of those six, what has been decided? Are they fit for community centers or not? I believe that I think it's about half and half. I think half are slated to go to other developmental centers and half are slated to go to the community. When you say slated, do you mean this is something that's occurred with discussion with the guardians? Because that's critical. If what we're talking about now is six people, if that's really the universe of folks that we're left discussing, and I mean six residents recognize that there are other people out there, guardians who are interested, and you say three of them are scheduled to go to another development center and three of them to go into the community, are you also telling us that the three that are going into the community are going into the community because that's a judgment that's been discussed with and agreed to by the guardians and to the extent possible by the residents? Yes. Yes. The first issue is where they want to go, where the guardians want them to go. If they want to go to the community, then there is an interactive process to where that's going to be. It's a very involved process. Because actually that raises a profound challenge for me anyway, and that is are we dealing with a mootness problem here? Right. Are we dealing with a circumstance here where three people are going into a development center and three people are going into the community, and the ones going into the community are going by consent and we're really not arguing about a live case in controversy? I think that's quite possible, Judge, but we're here on a grant of a motion to dismiss. Well, things become moot after motions to dismiss are granted. Right, but there still are appellants who reside at Woodbridge, and my understanding is the council is still arguing that they're not being afforded the opportunity to go to other D.C.s. Now, we disagree with that, but there seems to be a factual dispute over that. That's not what they argued today. They argued that they're asking for a right. They're saying that their declaratory judgment action was asking for a declaration that they had a right to have professional consultation to make a determination as to where the ultimate placement should be, alternate center or community. That's what Mr. York articulated. That's correct. And you're not willing or able to provide them with that professional consultation, or is it your answer that that is available, but there is some disagreement over the nature of that consultation? It's the latter. Our answer is that it is being provided. There's absolutely the opinion of the treatment team being provided as to whether a person can be served in the community or has to be served in an institution, and beyond that, it's the guardian's decision. Can you give us some education as to what the nature of those disputes are? I know it's not part of the record on appeal, but, I mean, we're dealing with people's lives, and this is a practical problem, I think. Well, and there's a mootness issue. And there's a mootness issue, right. The nature of the dispute with regard to what, Your Honor? Well, when you said the latter, I took you to mean that you are providing them professional consultative services, but obviously the fact that Mr. York is here advocating on behalf of his clients, they're unhappy with the nature or quality of those services. I think they're unhappy with the fact that, by and large, treatment teams are finding that people can be served in communities with the right supports because they prefer institutional care. But that decision, that opinion is being rendered. All right, but now what if, let's focus on the six. You said three you think were recommended as appropriate for community placement. What if a guardian disagrees with that recommendation? Do those three folks then have a right to be transferred into a development center, or do you just say that they're out on the street? Well, their wishes are respected. Whether they have a right is a different question. But if they say they want to go to an institution, the state is respecting that decision. How many institutions remain? Five. Well, six when Woodbridge closes, there will be five. Is this a plan that's been proposed to the governor to eventually close all of the centers? Not that I'm aware of. The background to this was that the state was in the process, the Department of Human Services was in the process of closing a different center, Vineland. While that was going on, the task force was created by the legislature, and from there we had the recommendation to close the other two, Woodbridge and North Jersey. I'm not aware of any recommendation to close all centers at this time. Is Vineland closed? No, Vineland is still open. Okay. And, in fact, as Mr. York mentioned, many residents are moving to Vineland. Okay. So this is not a case where all the centers are scheduled, targeted to be closed over a period of years? No, Your Honor. Do they have any choice in which development center to go to? Because to Mr. York's coercion argument, if they're told which development center they have to go to, and it might be the most remote or inconvenient, that could be coercive to cause somebody to keep a loved one closer by in a community center, and even though the loved one thinks that's not the right place. I don't agree that it would be coercive. They are given a choice to some extent, but the reality is that the centers all have maximum census. I'm sorry, they all have what? They all have a maximum census. What does that mean? It means that a person may prefer to go to one center, but there's no room, and as a result they have to go to a different center, which they don't prefer. A maximum census? A census, yes. So you mean there are no beds in some centers? Yeah. I don't know if I'd put it so technically there's no beds, but there's not the ability to care for a number beyond what's being cared for. And how many of the five are at maximum census? Oh, I know what 100 is. I think most of them are with the exception of Vineland at this moment, but people have moved to other centers beyond Vineland. So these six, then, have no choice. Their choice is essentially go to Vineland or go into a community center. I don't know if that's accurate. And, again, this is outside the please. I'm looking at data I got yesterday. I don't think they are going to Vineland. I thought you just said Vineland was the only one that wasn't at maximum census. That was my understanding, but I'm looking at the data right now, and it looks like they're going to other centers. All right. Mr. Hughes, getting into the details here of the update, we thank you for that. Under the Medicaid Act, what's your position as to whether or not the appellants here have a right under the Medicaid Act to demand treatment in a development center? The Medicaid Act provides a right to an ICF-IPD level of services. Okay, and what to you does that mean? What does that mean to the state of New Jersey? Well, as of now, it means that they have a right to services in an institution. I mean, I think there's some argument to be made that that's not the case, but as of now, that is what's going on. When you say as of now, what do you mean? Well, there may come a time where there are no centers. I mean, that's happened in other states, and I'm sure states have argued that the Medicaid Act does not require a state to have institutions. And I don't want to say the state is never going to argue that, but it's not arguing it now. And that's not the issue now? Correct. Okay. So you agree that that's what the Medicaid Act says? That is what it says, yes. And so if their position was, look, the state's saying to us, we're going to determine who's going in the community and who's going to stay in the center, and we don't have a say in the final decision, you would acknowledge that could be a violation of the Medicaid Act? If they're requesting institutional services not being given them, I think arguably it could be. I mean, that wasn't really advanced below. All right, but that's not your position. Your position is if they want to stay in the community, if they want to stay in the institution, you'll keep them in the institution? Yes, and, in fact, that's what they alleged in their complaint. So therefore, it's a violation of the Medicaid Act? I'm sorry? Therefore, there's no violation of the Medicaid Act? That's correct, Your Honor. They acknowledged in their complaint that they were being afforded the choice between a community placement and another institution, and that's what's the record on appeal. Well, they've taken the position, I thought, that that was inartfully worded and that that didn't mean that everybody was given that choice, but that some people were told go to the community and some people were told you could go to an institution. I don't know that they've conceded, as your remark implies, that they have acknowledged in their pleading that everybody will have that choice. But leaving that to the side for right now, what's your position? Your Honor, would you concede that the district court misstepped in taking the Medicaid issue up sua sponte without giving the plaintiffs an opportunity to be heard? I would not concede that, and I'm not so sure how material it is for this appeal because there's two provisions of the Medicaid Act, which this court has already determined that there is a private right of action. One of those is the one Judge Fischer just discussed, which entitles them to an institutional level of services. The other is a – I'm sorry, it's escaping me right now. Subsection 10 and subsection 15. Right. Right. And the district court said that they failed to state a claim on those. That's correct. And the reason they failed to state a claim is because they acknowledge in their complaint that they're being given the right to institutional services. Now, if they had had a chance to weigh in with the district court, perhaps they could have made the clarification that they've made here. But setting that aside, even if that was a misstep to do it sua sponte, they've had their – is your position that any error is harmless because they've had their chance to make a pitch here about the Medicaid piece? Yes, they've certainly had the ability to err before this court. But beyond that, I think these sections that are cited that Judge Tessler found there was no private right of action are somewhat mirrored by the sections for which there is a private right of action. So I'm not so sure how material the question is. All right. How about your position, if you've got one, on the substantive due process point I was questioning Mr. York about? We've got, you know, in their pleading, for example, the lead plaintiff, they describe Ms. Cirillo, and I'm not sure I'm saying her name right. I apologize if I've got it wrong. They list out the severe physical and mental challenges that she's dealing with, and they talk about how she's, quote, totally dependent upon staff to initiate and complete all activities of daily living. I think I've said that correctly. Is this a person who can consent? Is it right for the state to take the position that they're making voluntary choices? Well, if the individual cannot consent, then the decision falls to their guardian. And by and large, these individuals have guardians. So, I mean, I take your honest question to be that if they're not capable of consenting, then is the state somehow confining them? Is that the question? Well, that's my question. I'm trying to get your legal position on that. The position you articulate in your brief is they're there because they want to be there, and I'm trying to find out what sense does it talk about about them wanting to be there when they themselves can't, they're not in a position to articulate what they want sometimes. They don't know what they want because of their mental challenges. I'm trying to grapple with, and have you helped me grapple with, how do we deal with Deshaney and some of these other cases that speak in terms of heightened responsibilities to people in state custody when the only response you've given me is they're there because they want to be, and who knows what they want? It's maybe what their guardians want, but who knows what they want? Does the state owe obligations to them because they're, in effect, involuntarily there, or is there some other way we should be thinking about this substantive process question? Well, first of all, they've been assigned guardians pursuant to state court judgments by and large. So the guardian is making that decision in their stead, and the state is respecting that decision. Does the substantive process right then lead to them, to the guardians? It does not. It does not because the question is whether the person is involuntarily confined to an institution. The standard is not whether their degree of disability renders them incapable of making decisions. It's whether the state has taken an affirmative act to restrain them, and that's clear from Deshaney on down through precedent in this court. And what this court has said is that whether the individual is voluntary or involuntary is absolutely a vital question to whether there's a substantive due process right. It's also said you have to go beyond the mere terminology of whether it's involuntary and look to the facts of the case. But here there are no facts alleged that these people have been involuntarily confined. And, in fact, the relief they seek is to stay where they are, which is utterly inconsistent with a substantive due process claim. The relief their guardians seek, presumably, right? Correct. Anything else, Mr. Hughes? Let's see, I have ten seconds. Thank you, Your Honor. Mr. Koch? May it please the Court. Robert Koch on behalf of the United States. In this case, the state of New Jersey seeks to close two of its seven state institutions, and one of the questions presented by this appeal is whether the ADA, its integration mandate, and the Olmstead Supreme Court decision can be used to stop the state's efforts at integration. The district court in this case correctly analyzed and held that the answer is no. As this panel has recognized, this presents a difficult situation for many of the parents and guardians and family members in this case, and they do have avenues of recourse available to them. This panel is just deciding whether the Medicaid Act and due process give them rights. And what has been presented in this case, and that's not a dispute, is that there are also recourse under state law, but the ADA and Olmstead are not one of the recourse avenues open. The ADA is, as this Court's opinion in Helen L. recognized, the focus of the ADA was integration. The findings that Congress made in passing the ADA talked about the need to integrate, the history of segregation, and the integration mandate itself. The preamble talked about the need to integrate. The integration was paramount and talked about the discrimination of segregation. Can you talk for a moment, with all the players in here, maybe this wasn't something you'd focus on before, but our published decision, not the previous unpublished decision in Benjamin X. Rel. Yauch v. Department of Public Welfare, but the published decision wherein intervention was allowed, and the Court said in a few places it spoke in terms of the rights that the people had in relation to the ADA. Was that misguided language? What are we to do with that panel language? I think there are a few things you can do, Your Honor. First of all, that published opinion said that the Court was assuming without deciding that there were rights. In addition, the focus of the Court's holding talked about the fact that the settlement agreement in that case impacted in some way the individuals who were seeking to intervene. And so they had a right to intervene because they were within that zone of interest. It said nothing and made no holding with respect to whether they had specific legal rights that they could have brought and specifically whether Title II gave them legal rights. Your Honors, I know that Judges Fischer and Jordan, you've talked about how the questions in this case don't necessarily arise under Title II. If this panel has no other questions, we're happy to rest on our brief. Mr. York, on rebuttal. Mr. York, you heard what the State had to say. You said 15 people. Your Honor, my understanding is more than six. How can you not know? Because, Your Honor, let me explain. We can call up the facility. They don't share any information with us and find out what the current count is. We've had clients drop out. We try to call them on a regular basis, every one of them, and get updates. And there may be some that have moved or given up on the case. Some are very angry because the case hasn't brought the results that they wanted. There may be people who have not reported back to us after we asked to. You heard Mr. Hughes say anybody that wants to stay in a facility, they're going to be transferred to another facility. But he has never committed that to us, Your Honor. He started it today. Well, that's helpful. But we still need the process in place of these people to be evaluated. That goes with the planning. These people are being called up. Wait a minute. Sorry. There is a process in place. There's a process that the State of New Jersey has in place, a process that your clients are going through. And you're asking for a judicial process, but there's a state-adopted process for evaluation. But it's not occurring, Your Honor. That's the problem. Well, it must be occurring. No, it's not. It must be occurring. Well, we never had a chance to develop the record. We fully allege that it's not occurring, and it's not. We have people being called, like on the first of the month, and saying they're being moved on the 20th because there's an open bed in an island. All right. But they haven't been properly evaluated. You said you're not asking us to enter an order stopping the state from closing any center. Right. You're not asking for that. They've said that anybody who wants to stay in a center will stay in a center, and there's a process. People are being evaluated. They aren't being evaluated. That's the problem. That's what we want. Let's assume when you say they're not being evaluated, actually what you did allege was, and I can read you your language if you want, what you alleged was that the treatment teams were giving advice that you thought was misguided. It's not that there wasn't treatment advice. You didn't like the treatment advice. But set that aside for a moment, you know, and set aside the idea that it's a challenge to pull us into what, in effect, is a medical negligence assertion. And answer this if you can, because this is going back to what I tried to ask you before. If the state says anybody who wants to be in an institutional setting, we will put in an institutional setting, and by their count we're down to three people who say that, and they've promised them that, how is this case not moot? Well, again, Your Honor, because it is not just a matter of, you know, that's helpful if we do get a commitment that that is their position and they're going to stick with that position, that indeed people will have a right to have a developmental center, but we have not never been confirmed. Assume that they're good as their word. All right. Just for purposes of discussion. Then we still need the sound evaluation of the treating professionals to determine if that institutional setting is the correct setting. Even if assume that you've got treatment people in that said that's not the right setting for them. Is then your argument, well, then they have to stay in Woodbridge and we're back to the point that you really are asking for an order that says you've got to keep Woodbridge. No, what that amounts to, Your Honor, is then they have to do the proper planning and creation of those services to support them where they're going. So they have to build another institution. No, they have to either get the additional medical person they need, the dentistry services, whatever the services are, and put them in place where they're being transferred. You want an evaluation not just of the client, but of the five remaining institutions to see if they fit what the clients need. See if they have adequate service to meet the client's needs. That's correct, Your Honor. Assuming they didn't, would you have a right to make them provide those services in an institutional setting? I believe they couldn't be moved if they're going to be harmed, and that's our position, into another setting where they would be harmed or even suffer death. And that's what's going to result to some of these people if they aren't properly planned for and moved to an appropriate location.  Mr. York, thank you. Thank you, Your Honor. I think all counsel with their arguments. A very interesting case, and we'll take this matter under advisement.